# Richmond.

## MUTUAL RESERVE FUND LIFE ASSOCIATION v. TAYLOR.

### FEBRUARY 12, 1901.

1. INSURANCE—*Illegal Assessment—Remedies.*—If a life insurance company declares a policy forfeited because of the refusal of the policy-holder to pay an illegal assessment made upon him, the latter may either tender the amount actually due, and await the maturity of his policy, and then sue on it, or he may sue at once in the proper tribunal for reinstatement, or he may treat the policy as at an end, and sue at once to recover the just value thereof.

2. CONTRACTS—*Anticipatory Breach—Right of Action.*—When one party to a contract has entirely abandoned it, or has absolutely refused to perform it, the other party may sue on it at once, without waiting for the time of performance to arrive.

3. INSURANCE—*Assessments—Change of Rates—Terms of Policy.*—A stipulation in a mutual life insurance policy that "the rate of assessment may be changed to correspond with the actual mortality experience of the " company means that the proportion between different ages may be changed to meet the result of experience, and not merely that all rates must be increased the same percentage.

4. INSURANCE—*Unauthorized Assessment—Effect on Membership.*—The failure to pay an unauthorized assessment does not forfeit membership in a benefit society, nor the rights of the member under his certificate.

5. PLEADING—*Declaration—Anticipatory Breach of Contract—Willingness of Plaintiff—Acceptance of Renunciation.*—A declaration which sets out a valid contract between the plaintiff and the defendant, the renunciation of the contract by the defendant, the resulting damages to the plaintiff, and the readiness and willingness of the plaintiff to perform, without alleging any act done by the plaintiff after the renunciation by the defendant to compel the latter to perform, or to increase his liability, states a good cause of action. The willingness to perform indicates a disposition to do what is right, and the

suit shows the acceptance of the condition brought about by the defendant's renunciation.

6. CONTRACTS—*Construction by Parties—Acquiescence.*—While acquiescence in an unlawful demand is not a reason why a person shall continue to acquiesce, yet where the question is whether or not a right exists, or what construction shall be placed on an agreement where its terms are not clearly defined, the acquiescence by one party in the other's known construction, and compliance with his demands, is material and throws light on the question at issue.

7. INSURANCE—*Assessments—Reasonableness.*—An assessment may be reasonable as to one member of an association, because he has assented to it, and unreasonable as to another, because he has not assented to it.

8. PRINCIPAL AND AGENT—*Interest of Principal—Failure to Observe.*— It is the duty of an agent to act for the interest of his principal to the best of the agent's judgment and belief, but if his acts are so clearly against such interest as to show that he acted otherwise, his acts are void, and the principal is not bound except to an innocent party.

Error to a judgment of the Law and Equity Court of the city of Richmond, rendered March 17, 1900, in an action of *assump·sit*, wherein the defendant in error was the plaintiff, and the plaintiff in error was the defendant.

*Reversed.*

The opinion states the case.

*Charles S. Stringfellow* and *L. L. Lewis*, for the plaintiff in error.

*William L. Royall*, for the defendant in error.

PHLEGAR, J., delivered the opinion of the court.

This case is on a writ of error to a judgment of the Law and Equity Court of the city of Richmond in an action of *assumpsit* brought by James M. Taylor against the Mutual Reserve Fund Life Association.

The declaration contains two counts, the first of which avers,

among many other things, that the defendant association made a contract, or policy of insurance, or certificate of membership, whereby, in consideration of certain dues and assessments paid, and to be paid, by the plaintiff, it promised to pay to his wife, or, if she did not survive him, to his legal representatives, ninety days after satisfactory proof of his death, the sum of five thousand dollars; that Mrs. Taylor is dead; that the basis of all assessments which were to be made appeared in a table printed on the certificate or policy, which, with the certificate, the constitutions (there being five of them, the result of general revisions), the by-laws and certain mortuary and assessment tables, are made a part of this count.

The certificate, or policy as it is sometimes denominated in the declaration, contains the following provisions:

" Whenever the death fund of the association is insufficient to meet an existing claim by death, an assessment shall be made upon the entire membership in force at the date of such death, for such a sum as has been established by the Board of Trustees, according to the age of each member, as per table endorsed hereon, and the sum received from such assessment (less twenty-five per cent. to be set apart for the reserve fund) shall go into the death fund."

"After the expiration of each period of five years, during the continuance of this certificate of membership, a bond will be issued (bearing interest at the rate of four *per cent. per annum*, payable annually to the death fund), for an equitable proportion of the reserve fund, and the principal of said bond shall be available ten years from its date towards paying future dues and assessments under this certificate; and, should membership hereunder cease by death or otherwise, any portion of said principal, not thus used, shall be applied to increase the bonds issued at the next quinquennial apportionment to other members of the association holding certificates issued during the same year as this

certificate, and at which apportionment the rate of assessments may be changed to correspond with the actual mortality of the association."

" This certificate is issued and accepted subject to the express condition that if any of the payments above stipulated shall not be paid when due, at the office of the association in the city of New York, or to an agent of the association furnished with a receipt signed by its president or secretary;    *    *    *    *    * then, and in each and every such case, his certificate shall be null and void, and all payments made thereon shall be forfeited to the Association."

These provisions were in accord with the constitution and by-laws then in force, and with those now in force, except that the last constitution which was adopted in January, 1888, requires bi-monthly assessments. Each constitution provided for revision or amendment at any annual meeting by a two-thirds vote of the members present. The table of rates endorsed on the certificate provided: " The assessment rate for each member according to the age taken from the nearest birthday shall be as follows: Age 15 to 25, rate $1.00; age 26, rate $1.02;    *    *    * age 60, rate $3.00," and so on, providing a rate for every year's age from 15 to 65; those being the age limits within which the members were received.

This count also avers that the certificate and table endorsed thereon were a contract; that all assessments should be made on the same ratio as appeared in the original list, that is, if the assessment on one age was raised a given *per cent.* all should be raised the same *per cent.;* that the association had violated its contract, and had, February 1, 1898, made a new rate, whereby it increased the assessment against him and persons of his age at entry, sixty years, nearly eight fold, while the assessment upon persons who entered with him at twenty-five years of age was increased only two and one-fifth fold; that this was not

done to correspond with the actual mortality experience of the association, was illegal and oppressive, and that he had refused to pay it; that in consequence of such refusal the association had declared the certificate forfeited and void, refused to acknowledge any liability thereunder, or to acknowledge him as a member, and has completely renounced and broken its contract.

The second count avers the issuing of the certificate, and Mrs. Taylor's death; makes the certificate and the table of assessment rate endorsed thereon, and the February 1, 1898, assessment table, parts thereof; avers the same construction of the contract as to rates of assessment as is averred in the first count; also avers that the assessment of February 1, 1898, was contrary to the contract, unjust and illegal, but omits the averment that it does not correspond with the actual mortality experience of the association. It also avers the refusal of the plaintiff to pay the assessment, the declaration of the association that the certificate has been forfeited, its refusal to consider him as a member, and its entire repudiation of the obligations of the contract.

The defendant demurred to the declaration and each count thereof. The demurrer was overruled, the general issue was joined, and all matters of law and fact submitted to the court, which gave judgment against the defendant for $2,665, with interest and costs.

If the association, as the first count alleges, had adopted a basis of assessment which it was not authorized to adopt, and, because of the plaintiff's refusal to pay it, had declared his certificate or policy forfeited, refused to acknowledge him as a member, and disclaimed all liability under the certificate, he had the choice of three courses: To tender the amounts with which he was properly chargeable and wait until the policy became payable according to its terms, when his legal representatives could then have tested the question of forfeiture; to sue in the

courts of New York to be reinstated and to have the certificate continued in force; or to elect to consider the policy at an end, and to bring an action to recover the just value of the policy. 2 Bacon on Benf. Soc. Life Ins., sec. 376, and cases cited.

This court has, in the cases of *James* v. *Kibler*, 94 Va. 165, and *Lee* v. *Ins. Co.*, 97 Va. 160, adopted the rule that when one party to a contract has entirely abandoned it, or has absolutely refused to perform it, the other party may elect to sue on it without waiting for the time of performance to arrive.

The leading cases on this subject are *Hochster* v. *De La Tour*, 2 El. & Bl. 678; and *Rhoem* v. *Horst*, 178 U. S. 1.

We think both counts of the declaration misconstrue the contract in regard to changing the rate of assessment. If the clause providing that the "rate of assessment" might be changed each five years to correspond with the actual mortality experience of the association only permits the same percentage of increase on each sum named in the table printed on the certificate, it was useless and meaningless. There was no limit to the number of assessments which might be called, nor to the amount of each assessment, except that the proportion established by the original table was to be preserved until lawfully changed; that is, if one aged twenty-five was assessed one, five, or ten dollars, as might be done if the death claims required it, one aged sixty was to be assessed three, fifteen or thirty dollars, and in this way any amount of money needed for proper purposes could be assessed without changing the rate of assessments.

It was probable, or at least possible, that time would demonstrate that the rate was unequal or unjust. This was foreseen, and for that reason, doubtless, it was provided that "the rate of assessment may be changed to correspond with the actual mortality experience of the association," which, we think, means that the proportions or rates may be changed to meet the result of experience.

The first count alleges that the February 1, 1898, assessment

was not made to correspond with the actual mortality experience. If so, it was not authorized, and the plaintiff's failure to pay it did not forfeit his membership or his rights under the certificate. *Shultz* v. *C. Mut. L. Ins. Co.*, 59 Minn. 315; *Farmers F. Ins. Co.* v. *Knight*, 162 Ill. 470; *Lee* v. *Mutual L. Ass.*, 97 Va. on page 165.

It was earnestly argued that this case is not within the rule just stated because the declaration avers that the plaintiff was always ready and willing to comply with the contract, and by such averment shows that he had not accepted the defendant's renunciation as final, and thereby terminated the contract. If it is true, as stated in *Dingley* v. *Oler*, 117 U. S. 490, Book 29 L. C. P. Co., p. 984, that " the refusal of one party to deliver goods under a contract, if not treated as final by the party making the demand, cannot afterwards be treated as a refusal authorizing the commencement of the suit," we do not think that a willingness and readiness to perform a contract without any demand on the other party or without doing anything which places him in a worse condition, or which tends to enhance the damage which might be recovered, or deprives the innocent party of any right, or increases the rights or immunities of the wrongdoer, has that effect. The willingness to perform indicates a disposition to do what is right—the suit shows the acceptance of the conditions brought about by the other's refusal. What the result might have been if the declaration had alleged *some act done,* after the refusal of the association, to compel it to perform the contract or to increase its liability, it is not necessary to decide.

The first count states a good cause of action. The second count is faulty in not averring that the change in the rate of assessment was not made to correspond with the actual mortality experience of the association.

The evidence shows that from the time Mr. Taylor became a member of the company, viz., October 27, 1882, until February

1, 1889, the assessments were made on the basis of the table endorsed on his certificate, and of the age of entry; that February 1, 1889, a new table of rates was adopted, of which he had notice when the call of April 1, 1889, was made. This table increased the rate on persons from fifteen to twenty-five years of age about eighty *per cent.*, and on persons above fifty years of age more than one hundred and twenty-five *per cent.* This table states that it " is based upon the mortality tables and experience of the association and is for 'current ages.' " However, the assessments were made until June 1, 1895, on this table as of the age of entry.

On the 12th of June, 1895, the Board of Directors adopted preambles and a resolution which declared that the fundamental principle of the natural premium system on which this association was established is the equitable apportionment of the actual death cost among the members according to age and amount of insurance held; that the Superintendent of Insurance of the State of New York, in a report of his examination of the association, officially calls attention to the fact that inequality exists in the present mode of apportionment, in that members admitted in the earlier years of the association are being carried at a cost to them much below the benefits which they are receiving, and that he recommends that action be taken as speedily as possible to change the assessment rate to correspond to the *present age* of the members; that the actuary of the association was of the opinion that an assessment of the members admitted prior to January 1, 1890, on the basis of one-half the increase of age since admission would provide a remedy for the inequality, and therefore it was ordered that the rates of assessments for all such members be reapportioned, in accordance with the table then in use (that of February, 1889), adding to each one's entry age one-half the number of years since his entry. These preambles and resolutions were printed on the first call made thereafter, which was on August 1, 1895, and on each bi-monthly

call until the one made December 31, 1897, all of which were sent to Mr. Taylor, and the calls paid without complaint until August 28, 1897, when he complained by a letter to the president of the association of the hardship of the increased assessment and asked an explanation of why his assessment age was arbitrarily fixed at sixty-seven years. The letter was answered by another officer of the company, explaining how the age was arrived at. Mr. Taylor replied that he did not follow the reasoning of the letter, and still considered the advance in his assessment excessive and a hardship. Three days after this reply, he paid the October assessment, and a part of the December assessment, and afterwards paid the balance of the December assessment.

In 1897 the Board of Directors passed a resolution with preambles which declared that, in order to secure "equality and sufficiency in payment by policy-holders under the fifteen years' plan (to which Mr. Taylor's policy belonged) rates must follow the natural law of increasing cost due to increasing age; that the actuary reported as the result of careful examination and computation that the proceeds of calls upon that class on the basis on which they had been assessed since August, 1895, were not sufficient to meet the death claims properly chargeable to that class; that the association had no funds applicable to the deficiency, and that the future assessments should be on the basis of attained age and amount of insurance held by each member.

These preambles and resolution were reported to the stockholders at their annual meeting held January 26, 1898, and were unanimously ratified, and declared to be in accordance with the terms of the contracts with the members of that class, and of the power reserved to the association, and to correspond with the actual mortality experience of the association.

At that meeting, Mr. Taylor was represented by Frederick A. Burnham, who was president of the association, and to whom

he had given a proxy on the 30th day of December, 1895, which was to remain in force for ten years unless sooner revoked. Mr. Burnham cast Mr. Taylor's vote in favor of ratifying the action of the directors.

The parties agreed, as facts, that "the resolution of reapportionment adopted December 15, 1897, and the resolution ratifying said last resolution of December 15, 1897, adopted January 26, 1898, * * * * * were duly and validly adopted at meetings regularly called in accordance with the charter, constitutions and by-laws of the defendant company, and the laws of New York applicable thereto."

Accordingly a call was made February 1, 1898, on that basis which the plaintiff refused to pay, and for such refusal his certificate was declared forfeited. It is proven that the superintendent of Insurance gave the advice attributed to him, and that the assessment of February, 1898, is in accordance with the actual mortality experience of the association.

From this statement it will be seen that the table of assessment rate endorsed on the certificate or policy, was silent as to whether the assessments were to be for the amount stated for the age of entry, or for the current or attained age; that in February, 1898, the new rate was declared to be for the current age, and that the percentage of advance was not the same for all ages; that the assessments from February, 1895, to December, 1897, inclusive, were made on the average between the entry and the attained age; that the association in January, 1895, on the advice of the Superintendent of Insurance of the State of New York, asserted the right and declared the necessity for assessing according to attained age; that notice of these things was given the plaintiff; that he continued for three years thereafter to pay the assessments, and that he, by his lawfully appointed agent, voted to approve the action of the board in making the call of February, 1898, on the basis of fully attained age.

While it is true that acquiescence in an unlawful demand is

not a reason why a person shall continue to acquiesce, yet where the question is whether or not a right exists, or what construction shall be placed upon an agreement where its terms are not clearly defined, the acquiescence by one party in the other's known construction, and compliance with his demands, is material, and throws much light on the question at issue.

To sustain the judgment of the Law and Equity Court we will be compelled to say that the assessment of February, 1898, was either *ultra vires*, unlawful, fraudulent, or unreasonable, and that the vote cast by Mr. Burnham for Mr. Taylor was cast in bad faith. The agreed fact, that the resolutions " were duly and validly adopted at meetings regularly called in accordance with the charter, constitution and by-laws of the defendant company, and the laws of New York applicable thereto," disposes of the question of authority and legality. There is no evidence of fraud, unless it is to be inferred from the amount of the assessment. An officer of the State appointed to examine into the workings of such companies reported more than three years before, that such a step was necessary and " should be taken at the earliest opportunity." Notice of this was given to the plaintiff and of the company's action thereon, in increasing the assessment by adding to the age of entry one-half the number of years intervening between that and the time of assessment.

We cannot on those facts predicate a finding of fraudulent conduct.

The amount of the assessment on Mr. Taylor is large, about $141 per year on each $1,000 of insurance, less whatever portion of the reserve fund he might receive under the quinquennial apportionment.

The testimony of the witnesses is that the amount was not only reasonable, but necessary to sustain the association on the basis of its organization. Whether that evidence is true or false it is not contradicted.

An assessment may be reasonable as to one member of an

association because he has assented to it, and unreasonable as to another, because he has not assented to it. *Thibet* v. *Supreme Lodge K. of H.* (Minn.), 47 L. R. A., p. 136. Mr. Taylor, by his vote in the stockholders' meeting assented to this assessment. It is indeed his own act to the extent of his vote, and therefore reasonable as to him.

We are asked to hold that the vote was fraudulently cast, because it was so contrary to Mr. Taylor's interest, that his agent. must have acted in bad faith.

It is unquestionably the duty of an agent to act for the interest of his principal to the best of the agent's judgment and belief, and if his acts are so clearly against such interest as to show that he acted otherwise, his act is void, and the principal is not bound, except to an innocent party. If Mr. Taylor had been present in person at the meeting he would have represented two interests—his own, as an insured person, and, as a member, that of the company. It was his interest to keep the company alive, otherwise his insurance and all others would fail, and to do so at the lowest possible cost to himself.

His duty to the company was to authorize a sufficient assessment to keep it alive.

Who can say that he would not, at his age, have preferred to risk the payment of $141 per year on each $1,000 of his insurance rather than forfeit it, if he had been present and known all the circumstances? But, admit that he would not have done so in his circumstances, there may have been others of his age in different circumstances who wished to do so and for whose benefit the company should be kept alive, and therefore it cannot be said on the evidence before us that the agent acted fraudulently.

The judgment of the Law and Equity Court of the city of Richmond must be set aside, and this court, proceeding to render such judgment as should have been rendered, will enter judgment for the defendant.

*Reversed.*